Good afternoon. Jeanne Rees, UIC Immigration Clinic, Pro Bono Counsel for Mr. Lopez. Mr. Israel Lopez was a lawful permanent resident for 30 years and he has significant mental illness. This court has to remand the case because the government has conceded that the board failed to consider the risks of torture to Mr. Lopez in the aggregate. And so on that ground alone, without reaching any of the other issues, this court has to remand. Let me ask you a question about that. They should have aggregated the risks, but why aren't the risks still so speculative that there would be no point in remanding for aggregating? Well, the board seems to, I mean, I guess I disagree with your Honor that the risks are speculative. And the board failed to conduct an aggregated analysis, but then when considering, for example, acquiescence, the board considers acquiescence in the context of the National Psychiatric Hospital employees, which is not required. So acquiescence would only be relevant to the gang action. The board also kind of mixes up acquiescence with requiring an intent, which is an improper analysis. So I disagree that it's speculative. I think that there is substantial. Let's back up. I'm having trouble putting together what you're saying because of the level of abstraction. Because he's psychotic, he has a risk of electroconvulsive therapy and also of harassment and torture, he claims, by gangs. And also he claims a risk of torture by police. And the board considered each one separately instead of aggravating those three risks of torture. Have I got that right in terms of your argument? The board didn't consider the risk of torture from police. Okay. In the CAP analysis.  There's evidence that the police would beat him up, that it's very common for someone to be arrested, to be disproportionately imprisoned for people with mental illness, that they would hit them to make fun of them, verbally abuse them, tie them up, throw them in the back of a truck. And I think, Your Honor, that that's an important source of torture that's not analyzed by the board. What about the electroconvulsive therapy? I mean, they still use that in the United States for recalcitrant cases of depression. And as far as I understand, it's not considered torture in the United States. I think they give them anticonvulsants and some anesthesia and muscle relaxants the day of the electroconvulsive therapy. I don't really understand why that's torture, except for your claim that they don't anesthetize them adequately the day that they give the electroconvulsive therapy. So it's unconsented to, and it's not anesthetized, and that has been determined by the United Nations to constitute torture. Also, the board seems to agree that that could constitute torture, but says that Mr. Lopez, and I'm looking at page four of the decision, that Mr. Lopez For those who really would administer electroconvulsive therapies with the kind of anesthetic procedure they use while administering it. There is no anesthesia and there's no consent. And Dr. Newton With schizophrenics and people who are so deeply mentally impaired as psychotics are, I thought there often was not consent. It was just implied that if they were sane, they would consent. I thought that was pretty routine with psychotics. That's nowhere in the record. The record establishes that the World Health Organization for 30 years had been trying to improve the conditions for the treatment in El Salvador, that the United Nations Special Repertoire stated that unconsented to procedures without anesthetization, including electroshock therapy, could be torture. And the board seems to determine that Mr. Lopez doesn't establish the prevalence of that use, but doesn't say that unanesthetized, unconsented to electroshock therapy wouldn't constitute torture. And Dr. Nichols testifies about its overuse. It is typically given. It's frequent. It's a common treatment. It continues to be commonplace. It's common in the United States and all civilized countries, I think. And it's not the first line of treatment. We're very gravely depressed patients because of the risk of amnesia. But there's nothing extraordinary about it as treatment goes. The difference here is that in El Salvador it is, or in the United States, I should say, it's often used as a form of last result. There's evidence of that, that when other treatments haven't worked, here it is de facto treatment. Patients complain of memory loss, loss of cognition, lack of daily functioning as a result. And so this is very different than the use in the United States. And it's also, you know, without consent or anesthesia. Back to the, you know, the threshold point as to whether or not the board aggregated. I understand what the government has said, that it may be inconsistent. But I'm not sure that I agree for two reasons. I mean, although the board used the word chain of suppositions, the things that it listed clearly are not chain things that all have to occur. You know, the homelessness and the gang members' attention don't necessarily build on each other. They seem to be alternatives. But then there's the further sentence that says, the record does not support the respondent's assertion that the immigration judge relied on a single source of torture in assessing his risk of future torture as she explicitly considered the risk of torture from gang members, police and mental health staff. And then cites the correct pages of the IJ's analysis. So when the board itself says that the IJ didn't err in failing to aggregate, it's pretty hard to say the board failed to aggregate because it was aggregating and saying it was aggregating and doing that. So even if the government conceded it, the concession seems wrong to me. I think this requires the court to kind of read into what the board is saying. The board is saying that there's these two suppositions and that he hasn't established the more likely than not and then kind of throws in what the judge assessed in the aggregate. I think just invoking that terminology without actually, I don't think the board actually applied it here because there was no assessment of the likelihood of torture by police. They don't have to mention every, they don't have to write a discursus on every factor. We've said that many times. And they've said that the IJ didn't err in considering them in the aggregate. They obviously therefore themselves considered it in the aggregate, and therefore the question is just whether or not that's supported by substantial evidence. Well, I guess then why consider it a chain of suppositions? I think that's problematic that the board's considering a chain of suppositions if the correct analysis was done, which aggregates everything. So I see what Your Honor is saying, but I think that the board's saying they've assessed it in this way of chain of suppositions, and it's not clear from the decision it was done in the aggregate and the board's decision that we look at. And so I don't think that that's sufficient to kind of assume the proper analysis was done, especially in light of the government's own concession. What do you, with respect to the withholding issue, how do you read the BIA's decision with respect to this issue of whether he exhibited symptoms? Did it rely on that finding of the IJ or not, and how does that affect your analysis? The board just kind of relies on the immigration judge saying that he wasn't hospitalized here in the U.S. We do know he was incarcerated in the U.S. for a crime that led to the discovery of this undiagnosed mental illness. And so the board, to answer, I don't think that the board is upholding all of the immigration judge's determinations with regard to the nexus. I think it's just the judge is saying, well, just because he wasn't, the judge is relying on the IJ's finding that he wasn't institutionalized in the U.S., which is a very different analysis than what would happen to him in El Salvador, especially in light of this record with two psychologists and Dr. Nichols' testimony that his schizoaffective disorder and depressive disorder would be exacerbated and would lead, you know, his lack of having a network of a family would lead to him going to the National Psychiatric Hospital at some point, whether by referral, by the police, voluntarily. And I think the board confuses the intent required for CAF with the withholding analysis. The subjective intent of the persecutor is not relevant. The persecutor's motive is, right, the reason that they're causing the harm. But the harm itself has to be experienced, severe enough, considered offensive, because of someone's protected characteristics. So there doesn't have to be subjective intent to hurt someone. The Pichuskaya case is an example where Pichuskaya was given electroshock therapy in order to try to cure her, but the reason that she received that treatment was because of her protected characteristic of being a gay woman, you know, being part of this group of gay women. So the withholding analysis requires the subjective intent by the persecutors, by, for example, the National Psychiatric Hospital. The treatment he would receive there is clearly offensive. It would rise to the level of persecution, and it would be because of his mental illness and the behaviors because of his social group. So nobody else in the hospital would be experiencing that if they didn't have the mental illness and the associated behaviors. I think also the court errs because they say, well, there's this lack of funding, lack of treatment. That all kind of goes to the intent argument, and the board says that there's also this stigma. I think that Dr. Nichols is pretty unequivocal in his testimony that the stigma is the reason. Not and also, but that is the reason, and that's the root cause of the treatment. And so, but even if it was also a reason, it meets that reason for withholding that's required. So one other thing that I would just add to the kind of failure to aggregate here is the board talks about being considered to be torture, and so I think on that basis alone that there isn't this determination that there's no acquiescence for games, there's no police torture, and there's no torture for the National Psychiatric Hospital. That hasn't been held here by the board, and so the proper analysis has to be conducted, and the aggregation, even if it's not more probable than not he'd be tortured at the National Psychiatric Hospital, there has to be an evaluation of, well, what about the police, what about the gangs, in light of kind of all the relevant factors. I think the court can't read in so much. Counsel, suppose there were to accept the proposition that the board erred by not aggregating the various risks of torture, but also to see the record as not showing any substantial likelihood that it would have mattered if they'd aggregated. Are we able to deny the petition, or must we remand if that is the case? I think that you have to remand, Your Honor, because you would be then making a determination of substantial evidence that isn't based on a finding by the board. So the board has to make that determination. Thank you. I'll reserve my 40 seconds for her. Thank you. All right, so let's have counsel for the attorney general. Let's hear what's on video. Okay. Good afternoon, Your Honors. You know, I used it for the attorney general. May it please the court, you know, I used it for the attorney general. Substantial evidence. The court should deny the petition for review because substantial evidence supports the agency's determination that the petitioner did not meet his permanent proof for withholding of removal or protection under the regulations of the Convention Against Torture. The question, again, concerning withholding, let me ask the same question as your opposing counsel, which is how do you read the board's decision with respect to the issue of his not being a member of his, at least the first social group, because he didn't exhibit. There was no record evidence that he exhibited symptoms. Do you read the board's decision as relying on that ground or not relying on that ground? I believe that the board did expressly rely on that ground and focused on the nexus factor of whether or not even if he was a member of that group, even if those social groups were cognizable. When you read the board's decision, does it say that you relied on that ground? I think on page 4 of the record, the third full paragraph, the respondent did not present sufficient evidence to show, it's more likely than not that staff and psychiatric facility were on account of his membership in any of his proposed particular social groups. It appears to be indicating that viewing all those groups as cognizable and that he didn't think a member of those groups. But then it goes through and it gives a bunch of reasons in the sentences after that, and they talk about not previously being hospitalized and that the mistreatment is due to lack of staffing. These findings are not clearly erroneous. And then it talks about Dr. Nichols. There's nothing about not exhibiting symptoms. It's just not there. Well, I think, Your Honor, that determination of the subsequent sentences are referring to the likelihood of him experiencing persecution on account of his protected grounds. So I think the board is taking note of the fact that the petitioner wasn't hospitalized in the past because of mental health concerns or prescribing the medications, going to the fact that he did not demonstrate the more likely than not to clear probability piece of a withholding claim. I think that's how we understood it and how the board analyzed it. But suppose that I don't read the decision that way and therefore I don't see what the board relied on and affirmed and upheld the finding that he didn't exhibit symptoms. Would that affect how we'd have to view the remainder of the withholding claim? Would we have to view it on the assumption that he had or maybe did and that, therefore, that would affect the likelihood of mistreatment? When you say he had it and he exhibited symptoms, so he essentially, as they define the particular social group, that he was someone with a mental condition that exhibited symptoms to draw attention of gangs or police. Is that the context? Correct. So if the board doesn't uphold the finding that he didn't exhibit symptoms, can we then, in evaluating the likelihood of mistreatment for withholding purposes, can we then assume that he's not going to exhibit symptoms? That factor seems to make a difference in how likely it is that something bad will happen to him. I'm not sure you're on there today. The way that we understood it was the board didn't make that assumption or at least not necessarily that assumption. It simply treated those social groups as recognizable and those at the ground and proceeded to then look at the evidence in concluding that he failed to show that, show the need, his burden, and particularly the nexus portion. I think that's specific with gangs and police. The board found the evidence insufficient to show that he would, in fact, be, even if he were in those situations, even if, say, we were to assume, as Your Honor posits, that he would exhibit symptoms, that any such mistreatment resulting from that would be because of that protected ground. I thought the BIA just seemed to be confusing the protected ground with the exhibition of the symptoms, right? Because it was willing to acknowledge that, sure, if the petitioner were to be returned and to exhibit the symptoms of folks who are mentally ill, that that would attract the attention of gangs and the police and that he might well then suffer mistreatment as a result. But then it seemed to say, well, but even if that occurred, it wouldn't be because the gangs or the police were, quote, unquote, targeting him because of his status as someone with mental illness. And I just didn't understand how the BIA could permissibly draw that distinction. I think it looked at the record and observed that the petitioner may be subjected to harm. He may draw the attention of gangs. He may draw the attention of a police officer. But the question has to be, what was the motivation of the gang and the police to target him, to harm him? And the evidence in the record shows that, for example, as the petitioner's ex-productor Nichols noted, the police deal harshly with everyone. So he may be subjected to harm, but that just might be the unfortunate reality for the self-governed populace as a whole. And that's where the thought was getting at was that even if his mental illness may result in that erratic behavior or other symptoms, any such harm he experiences would be the unfortunate reality of a gang member seeking to maintain control of their territory, seeking to go after anyone that he was a challenge, not because they are aware of the petitioner's mental illness and seeking to target him based on that. That's the crux of the analysis here when we're discussing nexuses. Is there evidence to show that the gangs and police are aware of this mental illness and because of that mental illness are targeting the petitioner? And the agency correctly determined that. The evidence doesn't show that. Unfortunately, for violent individuals, gangs or police officers are acting in manners that are unfortunate and might cause harm to the petitioner, but not with that requisite nexus that the petitioner needed to establish. But the behavior that would attract the harmful, would attract the harm being inflicted upon him, it's inextricably intertwined with his mental illness. So, I mean, yeah, it's fine. Maybe somebody, I don't know, just take a silly example. You are acting in a bizarre way that attracts the attention of the police and they interpret your actions as being disrespectful and they beat you severely as a result of that, right? Yeah, maybe they don't know what the underlying cause of the person's behavior is, namely that it stems from his mental illness. But if that is, in fact, what's leading him to exhibit those behaviors and that that, in turn, is what's causing the persecutor to subject that person to harm, isn't that enough in terms of satisfying the nexus standard? I don't believe so, Your Honor. I think there has to be, I think the persecutor's motive, going back to Elias Zacharias, that that's kind of the focus here. Why did they harm him? Was it because of this protected ground? Because a gang member who sees someone acting erratically doesn't necessarily know that they're mentally ill. They could think that they're inebriated. They're on drugs or alcohol. They think they could be trying to be kind of funny or silly or something like that and have no idea what's going on. But what they're perceiving as a gang member is, this is a person questioning my authority or disrespecting me, and I'm going to target them. That's what the evidence shows. The evidence doesn't show that a gang member would be aware of their mental illness and target them. Because if it was someone who was inebriated, then the gang member would likely target them, too, just because of what they perceive as a threat, not because they know that individual consumed too much alcohol. I think that's the distinction here, where there has to be some understanding on the part of the persecutor when it relates to the individual that they're harming here. And the evidence doesn't show that. What about the evidence of harm that might be inflicted upon the petitioner at the NPH? I think Dr. Nichols said that at least part of the reason why folks there are subjected to treatment that might rise to the level of persecution is because of the stigma that's attached to the mentally ill in that country. It seems to me that the board was willing to accept that, but then somehow said, well, but that doesn't satisfy the A reason standard. And it seems to me, by definition, it does. Maybe you can respond to that point. Well, I think I'd draw the court's attention to the fact that the immigration judge and the board noted that the petitioner had never been hospitalized before, resulting from his erratic behavior or for any reason, or getting whatever he was ever taking or prescribing medications related to his mental illness. And I think that the agency took note of that in the context of, did he establish a clear probability that he would be, for example, in this case, in regards to your question, hospitalized? I think the agency observed that at first there wasn't necessarily a clear probability of that occurring, so that could be a sufficient basis to deny the claim based on the fears of mistreatment in the health care facility. But additionally, the agency noted that while the fact that there may be a stigma, the question goes back to, are the mental health practitioners subjecting the petitioner to mistreatment because of his mental illness? The evidence that the agency determined, no, that's not the reason. The reason would be that there's inadequate training, lack of funding, lack of understanding of how to take care of mentally ill individuals. And I point to the fact that Dr. Nichols noted that in engaging with medical students in El Salvador, many of them were unaware of the agreement of pretty traditional common mental health practices. Cognitive behavioral therapy are very things that are common, as we understand them, maybe in this country as we know them, but that there was just lack of training for those sorts of treatment modalities. And so that was the issue. He was talking about the students that he taught in medical school. In El Salvador, yeah, he would use that. I thought the idea in medical school was they don't know medicine, so you teach them medicine. If they come in ignorant, then hopefully they go out knowing something. That's true, Your Honor. I don't understand what the probative force is of showing that students in medical school didn't know something that a doctor ought to know. Fair enough, Your Honor. I was just more trying to focus in on the point that the inadequate training and the lack of experience in terms of various forms of mental health treatment results in the treatment that the petitioner may fear, not because of his mental health condition. I think that's why the agency came to that conclusion that any harm would not be a reason. His mental illness would not be a reason for the harm. But I would go back to the initial piece of it where the board stated that he didn't show clear quality. Let me back up to something that you just said. Sure. As I remember, convention against torture relief does not require that the group be one of the five, political persecution, opinion, religion, that sort of thing. It just has to be a group with some sort of social identification that is routinely treated adversely. Is that correct? Yes. I believe the torture definition includes actions that would stem you from discrimination or for other reasons targeting individuals. Yes. Okay, thanks. Can I ask you, if you concede that the board failed to aggregate the torture and instead analyzed it separately piece by piece, why wouldn't, in light of such a concession, we have to send it back to the board so it can perform the analysis that it should have performed and which we cannot perform because we'd have to apply deferential review to it? I think, as we noted, in terms of establishing a claim for eligibility for a cap protection claim, you have to demonstrate the length of the piece, which as we conceded could run afoul of Velazquez-Samoa, but you also have to demonstrate acquiescence by the government officials, and when you're looking at specifically whether the conduct constitutes torture, you have to look at the specific intent. So we took, and I believe the acquiescence petitioner, the agency, to correctly determine that acquiescence was not established as a relationship in a certain source of torture as well as the lack of specific intent was not demonstrated. I think that would be a sufficient basis to uphold the denial of the cap claim. Well, the lack of acquiescence applies only to the games, right? Because if it were the police or the NPH folks who were inflicting the torture, then there's no acquiescence issue there. So you're saying that as to the police and the NPH folks, the board found that they wouldn't be acting with a specific intent necessary to harm to constitute torture? I guess in terms of the NPH, I believe the NPH had a specific finding for a specific intent. The agency is less clear in terms of if a specific intent finding was made in regards to the police. Based off of the reading of that decision, the acquiescence, when it comes to the state act, the agency observes that the fact that there is evidence of the government of El Salvador combating those corrupt officials and making efforts to prosecute and arrest corrupt officials who are acting in such a manner that some of that is how the agency in terms concluded that there was an acquiescence in that regard. Okay. All right. Thank you very much. I appreciate your argument. Let's put two minutes on the clock for rebuttal. Thank you. To respond kind of more thoroughly to a question about the aggregation, if the board actually did aggregate here but just didn't do it in a very concise, clear way, I think that would require this court. The board didn't give an explanation then. They just said the immigration judge appropriately considered all the sources in the aggregate and appropriately denied. But there was no explanation as to why there was a denial. So this court would have to come up with that. I think also acquiescence was applied. We don't grade their papers. A or even a B+. If they wrote a C paper, then it's not our concern. Right. And it's also not your responsibility to kind of fill in the holes. I think you have to send it back so that they do the proper analysis. And I think that here also the board applied acquiescence to the National Psychiatric Hospital, which was wrong. And so I don't think that this court can correct that mistake and uphold the board's denial. Do you agree, though, with your opponent that the BIA did apply the specific intent finding that's in the impugnation that would kind of knock out that component? I think that the – I don't agree with that. I think that the board did kind of a halfway thing. I think the board considered sexual abuse and the unconsented electroshock therapy and said Mr. Lopez didn't meet the more probable than not. And then also the conditions, and the board uses the word conditions, don't have the requisite intent. So I don't think that the board was able to knock out all of the potential treatment at the National Psychiatric Hospital with it lacking the intent. I still have difficulty treating the liproconvulsive therapy and torture on a general issue of whether there's an intent to inflict pain, which is a requisite for torture. If a dentist is extracting a wisdom tooth and he's just not very good at administering anesthetic, it's going to hurt a lot when he pulls that wisdom tooth out. But his intention is not to inflict pain. It's to relieve the patient from the wisdom tooth that has infected him and needs to be pulled out. Why is it the liproconvulsive therapy without anesthesia, the same thing? Because the – Can you relieve depression? Because the wisdom tooth scenario would, you know, presumes that that tooth needs to be pulled. It presumes that that person's not being blamed for their wisdom tooth, where the record here says that people with mental illness are blamed for their condition. Sometimes they're considered demon-possessed, even medical. Yes. There is evidence in Dr. Nichols' testimony that doctors do hold this stigma. So I would say you're correct, Your Honor. I don't think Dr. Nichols testified that there are instances of doctors believing people are possessed by demons, but he testifies that the doctors subscribe to the stigma, and that they – which includes blaming people for mental illness. And so that is evidence of intent. And I'll leave that. Thank you. And I understand that you accepted this case through our proponent board. I did, yes. Well, maybe on behalf of the court, let me thank you very much for your willingness to do so. Thank you. I hope you represented your client very admirably here, and it's been a great service to the court. So thank you for doing that. Thank you. I appreciate that. The case just argued is submitted.
judges: KLEINFELD, WATFORD, COLLINS